**ST. PAUL FIRE & MARINE INSURANCE CO., a Minnesota corporation, Plaintiff,**

v.

**SERVIDONE CONSTRUCTION CORP., Joseph A. Servidone, Victoria Servidone, Goddard & Blum, and Ray Goddard, Defendants.**

**Civ. No. 4–91–656.**

United States District Court, D. Minnesota, Fourth Division.

Nov. 22, 1991.

---

Gregory T. Spalj, Buster C. Hart, Carrie A. Green, Fabyanske, Svoboda, Westra & Davis, St. Paul, Minn., for plaintiff.

Richard P. Mahoney, Victor E. Lund, Mahoney, Dougherty & Mahoney, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motion to dismiss for want of personal jurisdiction, for improper venue, and in the interests of federal comity pursuant to the first-filed rule.

### FACTS

This is an action brought by surety St. Paul Fire & Marine Insurance Company (St. Paul Fire & Marine) against principal Servidone Construction Corporation (Servidone), Joseph Servidone and Victoria Servidone as indemnitors for Servidone, and Ray Goddard and his law firm, Goddard & Blum, the attorneys for both Servidone and its indemnitors. Plaintiff St. Paul Fire & Marine, a Minnesota corporation, is an international insurance company. Servidone is a New York corporation in the business of construction contracting. Joseph Servidone is the president and owner of Servidone. He resides with his wife, Victoria Servidone, in the Northern District of New York. Ray Goddard resides in New York, and the law firm of Goddard & Blum is located in New York.

During the late 1970s and early 1980s, St. Paul Fire & Marine provided payment and performance bonds for Servidone in relation to various construction projects. On May 18, 1978, Joseph Servidone, on behalf of the corporation, executed an indemnity agreement protecting St. Paul Fire & Marine. On May 24, 1978, Joseph Servidone and Victoria Servidone personally agreed to indemnify St. Paul Fire & Marine in the event that Servidone defaulted. These indemnification agreements were prepared by St. Paul Fire & Marine and were executed in the state of New York. Neither of these agreements contains a governing law provision.

In October 1981, St. Paul Fire & Marine issued payment and performance bonds in connection with a U.S. Army Corps of Engineers construction contract worth approximately $25 million. That project was located in Grand Prairie, Texas (Joe Pool Dam project). Servidone obtained the bonds through a New York broker. In 1983 Servidone began to encounter various performance problems, which later proved to be the fault of the United States. At the beginning of February 1983, Joseph Servidone and Steven Sheridan, Servidone's in-house accountant, advised St. Paul Fire & Marine that Servidone was in financial trouble and would be unable to meet its next payroll on the Joe Pool Dam project. On February 8, Joseph Servidone, David Marmelstein, Servidone's general counsel, and David Trager, Joseph Servidone and Victoria Servidone's personal attorney, traveled to Minnesota to meet with representatives of St. Paul Fire & Marine. There were also several other negotiating sessions in New York and in New Jersey.

These negotiating sessions produced three specific agreements. First, the First National Bank of St. Paul loaned Servidone approximately $5 million through a revolving line of credit in exchange for a promissory note. While the note indicates on its face that it was executed in St. Paul, Minnesota on March 8, 1983 by Joseph Servidone as president of Servidone, Joseph Servidone alleges that it was executed in New York. Second, Servidone and First National Bank executed a revolving credit loan agreement, to be governed by the laws of Minnesota. Once again, Joseph Servidone contests the assertion on the face of the agreement that it was executed in St. Paul, Minnesota. Finally, Servidone and St. Paul Fire & Marine entered into a joint

control agreement on March 9, 1983. In that agreement, Joseph and Victoria Servidone and Servidone Construction Corporation, among other things, reaffirmed their respective indemnity obligations and agreed to complete work on the Joe Pool Dam project. In addition, the agreement provides that none of the agents of Servidone "shall become agents of St. Paul for any purpose whatsoever." Pl.'s Mem. in Opp'n to Mot. to Dismiss. Ex. D ¶ 49. While Joseph Servidone executed the document on behalf of the corporation in New York, the joint control agreement by its terms is to be governed by the laws of Minnesota. See Pl.'s Mem., Ex. D ¶ 52.

Servidone exhausted the $5 million line of credit by November 1983. St. Paul Fire & Marine then began loaning money directly to Servidone through a particular process. Servidone would prepare a list of invoices it wished to pay and would submit that list to St. Paul Fire & Marine for approval. Servidone would then prepare checks drawn on its corporate bank account in the amounts of the invoices. St. Paul Fire & Marine employed a New York branch of Touche–Ross, an accounting firm, to verify that the checks matched the invoice amounts. If St. Paul Fire & Marine approved the disbursement, Servidone would execute a promissory note in the amount of the advanced funds. Through this process, St. Paul Fire & Marine loaned Servidone approximately $29 million over the course of six years.

Because of the performance problems encountered at the Joe Pool Dam project, Servidone decided to bring a claim against the United States (Cl.Ct. No. 282–84C) (court of claims litigation). Ray Goddard and the New York law firm of Goddard & Blum represented Servidone. The firm has no offices in Minnesota and has never solicited business in Minnesota. None of the partners of that firm has ever practiced law in Minnesota. During the course of the litigation, no lawyers of Goddard & Blum ever met with representatives of St. Paul Fire & Marine in Minnesota. After a trial, which took place in Washington, D.C. and Texas, Servidone obtained a judgment of approximately $25 million. The United States Court of Appeals for the Federal Circuit affirmed that judgment.

St. Paul Fire & Marine apparently attempted to get at the judgment proceeds. Although the documents submitted by the parties are not clear, Ray Goddard alleges that St. Paul Fire & Marine entered into an agreement to use a bank as a front for a secret assignment. See Defs.' Mem. in Supp. of Mot. to Dismiss, Aff. of Ray Goddard ¶ 22 at 6. St. Paul Fire & Marine's position is that it owned the proceeds of the judgment because a clause in the various contracts Servidone executed purported to convey the rights to any and all accounts receivable in the event of Servidone's default. According to Servidone, the government recently advised it that St. Paul Fire & Marine filed a claim for the funds pursuant to the Assignment of Claims Act, 31 U.S.C. § 3727, but that the government rejected the claim as an invalid assignment.

After the Federal Circuit affirmed the $25 million judgment, St. Paul Fire & Marine and the various defendants began negotiating a possible settlement. Meanwhile, on August 1, 1991, Servidone commenced a mandamus action in the Southern District of New York to obtain the judgment proceeds. Servidone also commenced an action against St. Paul Fire & Marine and its bank in the United States District Court for the Northern District of New York on August 21, 1991 (Civil No. 91–0943). In that action Servidone is seeking damages in the amount of $25 million for, among other things, breach of contract, tortious interference, bad faith, fraud and slander of business reputation.

Six days later, on August 27, 1991, plaintiff commenced the instant action against Servidone, Joseph Servidone, Victoria Servidone, Ray Goddard and the law firm of Goddard & Blum. Plaintiff seeks declaratory relief that it is entitled to all moneys owed to Servidone by the United States pursuant to the doctrine of equitable subrogation, and that its rights in those moneys are superior to those of any of the defendants. Additionally, plaintiff seeks to hold Joseph Servidone and Victoria Servidone liable for Servidone's outstanding debt, in

accordance with the terms of their respective indemnity agreements. Finally, plaintiff alleges, among other things, that its interests were represented by Ray Goddard and his law firm in the court of claims action and that by asserting a claim for the sum of the proceeds of the court of claims judgment, Goddard and his firm breached fiduciary obligations arising from an attorney-client relationship.

On October 15, St. Paul Fire & Marine filed an amended answer in the action pending in the Northern District of New York in which it asserted counterclaims against Servidone as well as Joseph Servidone, Victoria Servidone, Ray Goddard and Goddard & Blum. These counterclaims appear to be identical to the claims asserted by St. Paul Fire & Marine in this action and seek the same relief.

Defendants move the Court to dismiss the action for three separate reasons. First, defendants claim that the Court lacks personal jurisdiction. Second, defendants allege that this action is improperly venued and should be transferred pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Northern District of New York. Finally, defendants claim that because there are currently two actions pending in two separate districts arising out of the same transaction and seeking the same relief, the Court should dismiss this action in the interests of comity and judicial economy in favor of the first-filed action.

## DISCUSSION

I. *Whether the Court has Personal Jurisdiction Over the Defendants*

Defendants have challenged the Court's assertion of personal jurisdiction over them. Plaintiff bears the burden of proving that defendants have maintained the minimum contacts necessary to enable the forum state to obtain personal jurisdiction over the defendants. *Dangerfield v. Bachman Foods, Inc.*, 515 F.Supp. 1383, 1385 (D.N.D.1981); *Block Industries v. DHJ Industries, Inc.*, 495 F.2d 256, 259 (8th Cir.1974). Plaintiff need only make a prima facie showing that the Court has

jurisdiction under a long arm statute. *Neiman v. Rudolf Wolff & Co., Ltd.*, 619 F.2d 1189, 1190 (7th Cir.), *cert. denied*, 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148 (1980). On a motion to dismiss for lack of personal jurisdiction, the Court may properly examine affidavits and depositions to establish the jurisdictional facts. *Dangerfield*, 515 F.Supp. at 1385, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1351. When considering a motion to dismiss, the Court must treat the facts contained in plaintiff's complaint, affidavits, and depositions as true, and any dispute in the facts will be resolved in favor of plaintiff. *School District of Kansas City, Mo. v. State of Missouri*, 460 F.Supp. 421, 432 (W.D.Mo.1978), *appeal dismissed*, 592 F.2d 493 (8th Cir.1979); *Schermerhorn v. Hoiland*, 337 N.W.2d 692, 693 (Minn.1983).

Whether a defendant is subject to the jurisdiction of the Court requires a two-step analysis. First, the Court must determine whether the defendant's activities within the forum state are embraced by the applicable state long arm statute, as interpreted by the courts of Minnesota. Second, the Court must determine whether the exercise of personal jurisdiction is consistent with constitutional due process. *Precision Construction Co. v. J.A. Slattery Co., Inc.*, 765 F.2d 114, 115 (8th Cir.1985). The first question is one of state law, while the second is one of federal law. *Id., citing, Iowa Electric Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303 (8th Cir.1979), *cert. denied*, 445 U.S. 911, 100 S.Ct. 1090, 63 L.Ed.2d 327 (1980). However, since Minnesota, like many states, has a long arm statute that provides for long arm jurisdiction to the maximum extent permitted under the Due Process Clause, the state-law element of the two-part test has been effectively eliminated for federal courts sitting in this state. *See, e.g., Fingerhut Gallery, Inc. v. Stein*, 548 F.Supp. 206, 208 (D.Minn.1982).

The "constitutional touchstone" for personal jurisdiction is whether a defendant has purposely established "minimum contacts" in the forum state "such that he should reasonably anticipate being haled

into court there." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985), *citing International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 580, 62 L.Ed.2d 490 (1980); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). The Supreme Court in *Burger King,* 105 S.Ct. at 2184, explained this standard as follows:

> where the defendant "deliberately" has engaged in significant activities within a State ... or has created "continuing obligations" between himself and residents of the forum ... he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

(Citations omitted.)

▮ The leading case in the Eighth Circuit is *Aftanase v. Economy Baler Co.,* 343 F.2d 187, 197 (8th Cir.1965) in which the court set forth five factors to determine whether there have been sufficient minimum contacts to satisfy the requirements of due process. The first three factors are of primary significance:

> (1) the quantity of defendant's contacts with the forum state; (2) the nature and quality of the contacts; (3) the source and connection of the cause of action to the contacts;

The last two are of secondary significance:

> (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

*See Jones v. Bankers Trust Co.,* 441 F.Supp. 317, 320 (D.Minn.1977); *Toro Co. v. Ballas Liquidating Co.,* 572 F.2d 1267, 1270 (8th Cir.1978); *Land–O–Nod Co. v. Bassett Furniture Industries,* 708 F.2d 1338, 1340 (8th Cir.1983). Indeed, *Burger King* indicates that the forum state's interest and the convenience of the parties are factors which should be weighed after the Court has determined that sufficient mini-

mum contacts exist. *Burger King,* 105 S.Ct. at 2184. Of course, these factors do not establish a mathematical formula, but rather provide a general guide in applying the abstract concept of due process. Each question of personal jurisdiction must be decided depending upon the particular facts and circumstances of each case. *Dangerfield,* 515 F.Supp. at 1388, *citing Gardner Engineering Corp. v. Page Engineering Co.,* 484 F.2d 27, 31 (8th Cir.1973).

A. Servidone Construction Corporation

The first question is whether Servidone has engaged in sufficient minimum contacts with the state of Minnesota. Plaintiff claims that Servidone has had the requisite contacts. According to plaintiff, Servidone and plaintiff have had a business relationship spanning three decades. During the course of that relationship, plaintiff, a Minnesota corporation with its principal place of business in Minnesota, loaned Servidone approximately $25 million. Servidone through its officers executed promissory notes that were payable in Minnesota and were understood to be governed by Minnesota law. Representatives of each company exchanged volumes of correspondence and myriad telephone calls in relation to those loans. Many of those loans are by their terms governed by the laws of Minnesota. Servidone's president on one occasion traveled to Minnesota to secure additional financing. In addition, plaintiff as a bonding company placed its own assets on the line for the benefit of Servidone. Plaintiff further claims that there is a direct connection between its claims and these numerous contacts, and that most of the witnesses and documents relevant to this action are located in Minnesota. Finally, plaintiff claims that because it is a long-established, respected corporate citizen, Minnesota has a vital interest in providing a forum for this litigation. Thus, the plaintiff believes that Servidone's relationship with Minnesota satisfies the *Aftanase* factors.

In response, Servidone claims that it is a New York corporation with its principal place of business in New York. It allegedly is not licensed to do business in Minne-

sota, has never done business in Minnesota, and has never solicited business in Minnesota. Although it recognizes that St. Paul Fire & Marine financed it over the course of years, Servidone claims that all of these bond and loan transactions took place in New York, through a New York broker. Servidone also contests plaintiff's assertion that the majority of evidence in this case is to be found in Minnesota, instead claiming that New York, the home of the corporation, is the site of most of the evidence. Finally, because plaintiff is an international insurance company that does substantial business in the state of New York, Servidone claims that the convenience of the parties as well as the extent of its contacts with Minnesota compels the conclusion that the Court lacks personal jurisdiction over it.

■ In order to accept Servidone's argument, the Court would have to evaluate each of Servidone's contacts individually, without regard to the totality of the circumstances. Generally, "merely entering into a contract with a forum resident does not provide the requisite contacts between a [nonresident party] and the forum state." *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303 (8th Cir. 1979), *cert. denied*, 445 U.S. 911, 100 S.Ct. 1090, 63 L.Ed.2d 327 (1980). The United States Court of Appeals for the Eighth Circuit has continually rejected the argument that phone conversations and written correspondence alone support a conclusion that a defendant purposefully availed himself of the benefits of a state such that he should reasonably foresee being haled into court there. *See Wines v. Lake Havasu Boat Mfg., Inc.*, 846 F.2d 40, 42 (8th Cir. 1988). Similarly, borrowing money from a bank in the forum state does not necessarily satisfy minimum contacts. *Pioneer Ins. Co. v. Gelt*, 558 F.2d 1303, 1309; *see T.J. Raney & Sons, Inc. v. Security Sav. & Loan Ass'n*, 749 F.2d 523, 525 (8th Cir. 1984) (per curiam). Designating Minnesota "as the place for payment on the note was also not an 'act by which [Servidone] purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and pro-

tections of its laws.' ... Rather, the place of payment was an unbargained-for convenience for the benefit of the plaintiff." *Savin v. Ranier*, 898 F.2d 304, 307 (2d Cir.1990) (citations omitted). Receiving financing from a forum-state bank cannot automatically establish sufficient minimum contacts in the forum state. *See Savin*, 898 F.2d at 307 (*citing Burger King*, 471 U.S. at 478, 105 S.Ct. at 2185).

■ Taken as a whole, however, the contacts presented by plaintiff indicate a long-term, systematic business relationship. During the several years constituting the relevant period, Servidone fostered its long-standing financial relationship with St. Paul Fire & Marine. Servidone requested and accepted approximately $25 million in financing from plaintiff. Its president actually traveled to Minnesota to secure this financing. Although many of the relevant documents were executed by Servidone's president in New York, many were also executed in Minnesota. Several important financial documents, specifically the joint control agreement and the revolving credit agreement with the First National Bank of St. Paul, are expressly governed by Minnesota law. Further, St. Paul Fire & Marine's assets in Minnesota were implicated because of its obligations to Servidone as its surety. Servidone's position that it did not purposefully avail itself of the benefits of doing business in Minnesota is unsupportable. *See Gelt*, 558 F.2d at 1309 (noting that the nature, size and purpose of a loan are relevant factors in determining whether sufficient minimum contacts arise between a borrower and the forum state).

St. Paul Fire & Marine's claims for relief also arise directly out of those contacts with Minnesota. It alleges that Servidone, by defaulting on its loan agreements, assigned its right to the proceeds of Servidone's judgment according to the terms of its loan agreements. Plaintiff's claims for declaratory relief therefore stem directly from Servidone's conduct during the financing period. Similarly, plaintiff's claims for monetary relief derive from the loan agreements and the promissory notes. Some of these were executed in Minnesota,

are payable in Minnesota and are governed by Minnesota law.

Finally, the convenience of the parties and the interests of the forum state weigh in favor of the exercise of jurisdiction. Both plaintiff and Servidone can list documents and witnesses that are located in its preferred jurisdiction. While Servidone is quick to argue that St. Paul Fire & Marine is an international insurer, and that it could easily bear the burden of conducting litigation in New York, Servidone does not claim that litigating this action in Minnesota would be highly detrimental to it. Similarly, plaintiff correctly notes that the Court has an interest in providing injured residents of this state with a forum, particularly given the enormity of its claims. The Court finds that because Servidone's contacts involved with the forum state demonstrate an ongoing, systematic financial relationship with plaintiff, and the lesser *Aftanase* factors also weigh in favor of jurisdiction, due process permits the Court to exercise personal jurisdiction over Servidone.

B. Joseph Servidone and Victoria Servidone

The next question is whether the Court may exercise personal jurisdiction over Joseph Servidone and Victoria Servidone. These defendants allege that they are citizens of the state of New York. Although Joseph Servidone traveled to Minnesota on behalf of Servidone to request financing from plaintiff, Victoria Servidone has never physically entered the state. The disputed transactions, according to these defendants, took place in New York. Accordingly, Joseph Servidone and Victoria Servidone request that the Court dismiss for want of jurisdiction.

In response, plaintiff argues that its claims against these two defendants arise directly out of contracts with it, a Minnesota resident. First, plaintiff claims that the indemnity agreements, promissory notes and the joint control agreement are to be governed by Minnesota law. Some of these agreements contain choice-of-law provisions expressly calling for the application

of Minnesota law. According to plaintiff, these provisions reinforce the deliberate affiliation with Minnesota, constituting a purposeful submission to the Court's jurisdiction. Second, plaintiff notes that Joseph Servidone on one occasion came to Minnesota to meet with representatives during negotiations. These contacts, plaintiff claims, satisfy the minimum contacts necessary for the Court to exercise jurisdiction in accordance with due process.

■ The Court finds that the contacts which Victoria Servidone has had with Minnesota are that some documents which she executed in New York contained provisions that required the application of Minnesota law. She has never set foot in the state. While plaintiff alleges that the defendants in general engaged in numerous phone conversations with and sent a multitude of letters to Minnesota residents, there is some question as to whether Victoria Servidone was the source of any of these communications. Thus, the plaintiff's argument relies principally upon Victoria Servidone's indemnity agreement and joint control agreement. This contract is an insufficient basis upon which to rest the exercise of jurisdiction. *See Iowa Elec. Light & Power Co.*, 603 F.2d at 1303.

■ The question is easier with respect to Joseph Servidone. Unlike his spouse, Joseph Servidone is alleged to have personally initiated innumerable telephone calls with Minnesota residents. He also is claimed to have personally sent letters to Minnesota. Finally, and most importantly, Joseph Servidone actually traveled to Minnesota to secure financing for his business. Joseph Servidone had a personal stake in this financing because it directly affected the success of his business. The Court finds that this constitutes the purposeful availment of the right to do business in Minnesota such that the exercise of jurisdiction over Joseph Servidone comports with due process.

C. Ray Goddard and Goddard & Blum

The final jurisdictional question raised is whether the Court has personal jurisdiction over Servidone's attorney and his law firm.

These defendants claim that they are both New York residents. The firm consists of no partners, including defendant Goddard, that are licensed to practice in Minnesota. The firm has never solicited business in Minnesota. These defendants also contest plaintiff's assertion that St. Paul Fire & Marine was ever one of their clients, claiming that they represented only Servidone. While the firm may have been representing plaintiff's interests in the claims court litigation, no representative of the firm ever sent billings to plaintiff, nor did any representative travel to Minnesota to conduct business with plaintiff. These defendants admit to contacting St. Paul Fire & Marine by telephone on occasion, but claim that the purpose of those calls was to obtain information in the nature of status reports or copies of briefs which had been filed on behalf of Servidone. *See* Defs.' Reply at 4. Thus, these defendants maintain that no attorney-client relationship ever arose.

Plaintiff responds that by representing Servidone both defendant Goddard and his law firm represented plaintiff's interests in the claims court litigation. Plaintiff also claims to have supplied the funds that were used to pay these defendants' attorneys' fees in the claims court litigation. According to the plaintiff, these facts give rise to an attorney-client relationship and accompanying fiduciary duties. Plaintiff further alleges that these defendants breached these fiduciary duties by asserting a claim to the proceeds of the claims court litigation. In addition, plaintiff maintains that by bringing that claim, these defendants have interfered with Minnesota business relationships. Finally, plaintiff claims that a representative of these defendants committed fraud by requesting that plaintiff refrain from recording the purported assignment of Servidone's rights to the proceeds of the claims court judgment in the interests of avoiding any real party-in-interest problems. These three torts, according to plaintiff, satisfy the minimum contacts necessary for the exercise of personal jurisdiction.

■ Contrary to plaintiff's assertion, an attorney-client relationship, regardless of who initiates it, is insufficient in and of itself to support personal jurisdiction. *See Federal Deposit Ins. Corp. v. Malmo*, 939 F.2d 535, 537 (8th Cir.1991). In *Austad Co. v. Pennie & Edmonds*, 823 F.2d 223 (8th Cir.1987), the United States Court of Appeals for the Eighth Circuit held that South Dakota lacked personal jurisdiction over a New York law firm that represented a South Dakota company where the claims arose from its representation of the company in Maryland courts. *See id.* at 227. Defendant was a New York law firm specializing in patent litigation. Although defendant never advertised its services or solicited clients in South Dakota, the firm was listed in the Martindale-Hubbell Law Directory. Plaintiff, a South Dakota corporation with its principal place of business in South Dakota, was a sporting goods distributor. Plaintiff, as well as other companies, received a letter from a competitor alleging patent infringement. Plaintiff and the other companies retained the services of defendant law firm to represent them. Defendant commenced an action for a declaratory judgment as to the validity of the competitor's patent in federal district court in Maryland. During discovery, defendant sent an associate and a law clerk to plaintiff's offices in South Dakota for a three-day stay. The parties had a falling out over the issue of fees. Plaintiff filed a legal malpractice action in federal court in South Dakota. Defendant moved to dismiss for want of personal jurisdiction. The district court granted defendant's motion. *See id.* at 225.

The sole issue on appeal was whether the district court erred in dismissing the action. The court of appeals recognized that, like Minnesota, South Dakota had enacted a long-arm statute intending to confer jurisdiction to the fullest extent permissible under the due process clause. *See id.* The court then turned to the five-factor test set forth in *Aftanase* and reiterated in *Land-O-Nod*. The court noted that the firm's contacts with South Dakota amounted to the three-day discovery stay by two employees, numerous phone calls, the use of courier services, monthly billings to plaintiff and checks paid by a South Dakota

bank. While the court recognized that the parties had an attorney-client relationship, it nonetheless concluded that due process precluded jurisdiction. *See id.* 823 F.2d at 226. First, defendant did not maintain an office in South Dakota, nor did any of its attorneys reside there. *See id.* Second, defendant did not solicit business there. Third, a third party arranged for plaintiff to be represented by defendant. *Id.* Finally, the actions giving rise to the lawsuit took place in Maryland, not South Dakota. *Id.* Given these other circumstances, the Eighth Circuit concluded that defendant had not purposefully availed itself of the benefits and protections of South Dakota laws such that the exercise of jurisdiction comported with due process.

Plaintiff's reliance upon *National City Bank of Minneapolis v. Ceresota Mill, Ltd.*, 476 N.W.2d 787 (Minn.Ct.App.1991) for the proposition that an attorney-client relationship, standing alone, satisfies the requirements of personal jurisdiction is misplaced.[1] In that case, a California lawyer represented Tom Whitney and Donna Whitney as their family attorney. In 1985, when the Whitneys became major investors in the Whitney Hotel, a Minneapolis real estate project, they executed certain guaranties. According to one of the provisions of the guaranties, Donna Whitney's liability would be discharged in the event of her husband's death.

Tom Whitney died in 1987, a time when the financial status of the real estate project was uncertain. In January 1987, Donna Whitney asked her California lawyer to help her assess what was transpiring in Minnesota. At her request, this lawyer made approximately four trips to Minnesota. He sat in on at least four day-long meetings concerning the status of the project. His firm's time sheets show extensive contacts with Minnesota by mail and by telephone in relation to this project.

Whitney was asked by her Minnesota counsel to provide opinion letters regarding the validity of her guaranty. The California lawyer and his law firm provided those letters, indicating that the guaranty was valid. The firm apparently neglected to advise Whitney about the release provision. Believing herself to be financially tied to the project, Whitney invested more money. Eventually, however, the project failed. The lender filed an action against Whitney, among others, on her guaranty. In the meantime, the California lawyer had left his former firm and joined a new one. Whitney brought a third-party claim against the lawyer, and both law firms. The lawyer's former firm contested jurisdiction.

The Minnesota Court of Appeals held that the district court did not err by exercising jurisdiction over the nonresident law firm. *National City Bank*, at 792 (Minn. Ct.App.1991). Although it did not mention *Austad*, the court indicated that Minnesota had adopted the *Aftanase* test for the presence of jurisdiction. *See Dent–Air, Inc. v. Beech Mountain Air Serv., Inc.*, 332 N.W.2d 904, 907 (Minn.1983). Under this test, the court first evaluated the quantity of contacts that the lawyer's former firm had had with the state of Minnesota. The court found that the firm's time sheets demonstrated a continuous, systematic relationship with Minnesota. Further, one of the firms' lawyers traveled to Minnesota for day-long meetings on four separate occasions to render business and legal advice. *National City Bank*, at 790 (Minn.Ct.App. 1991). Although the court believed that the large number of contacts satisfied *Aftanase, see id.*, the court went further and examined the quality and nature of these contacts. According to the court, the law firm was intimately involved in advising Donna Whitney regarding this large, Minnesota real estate project. *Id.* at 790–91. In light of these numerous and substantial contacts, the court of appeals held that the lawyer's former firm had sufficient contacts with Minnesota to subject it to jurisdiction, not that the attorney-client relationship, standing alone, satisfied *Aftanase*.

---

**1.** After hearing oral arguments, the Court received correspondence from plaintiff's counsel on November 8, 1991, in which counsel submitted this case in support of its motion.

In this case, assuming that an attorney-client relationship existed between plaintiff and Goddard, *Austad* precludes the exercise of jurisdiction. There is no indication that Goddard or any of his partners have ever physically entered the state in connection with the facts giving rise to this litigation. Billings were never sent to the plaintiff. Plaintiff presents no retainer agreement in support of its argument. As was the case in *Austad,* neither Ray Goddard nor his law firm reside in Minnesota. Neither has ever solicited business here. Servidone "arranged" for the representation of St. Paul Fire & Marine, assuming such a relationship ever existed. Finally, the actions giving rise to the claims in this action took place in New York, Texas and Washington, D.C. The Court therefore finds that it lacks jurisdiction over defendant Goddard and his law firm.[2]

II. *Whether the Court Should Sever Plaintiff's Claims Against Defendants Victoria Servidone, Ray Goddard and Goddard & Blume and Transfer Those Claims to the Northern District of New York*

In sum, the Court finds that it may exercise personal jurisdiction over Servidone and Joseph Servidone, but that it lacks jurisdiction over Victoria Servidone, Ray Goddard and Goddard & Blum. Although courts generally order dismissal of parties who are not subject to jurisdiction, plaintiff in this case asks the Court to transfer this action to the Northern District of New York. Plaintiff alleges that the defendants have moved that district court for an order dismissing plaintiff's counterclaims because they were not commenced within the applicable limitations period. If the Court dismisses certain of the defendants in this case, plaintiff maintains that those defendants will then argue that plaintiff's claims are time-barred in New York. If this Court grants defendants' motion and dismisses for want of jurisdiction, and the New York court grants defendants' motion to dismiss, then plaintiff's claims against those defendants will be effectively lost. Plaintiff requests that the Court transfer the case in the interests of justice.

In response, defendants maintain that transfer is not an option for the Court. According to defendants, lack of personal jurisdiction will always lead to dismissal of the action. Defendants claim that there is no authority for the proposition that a federal court may transfer a case notwithstanding the fact that it lacks personal jurisdiction over a defendant.

Contrary to defendants' position, the Supreme Court has clearly held that 28 U.S.C. § 1406(a) permits federal courts to do just that.[3] The plaintiff in *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962) brought a private antitrust action against a number of defendants in the United States District Court for the Eastern District of Pennsylvania. On defendants' motion to dismiss for lack of personal jurisdiction and for improper venue, the district court determined that venue was improperly laid as to two of the defendants. The district court transferred the entire action pursuant to section 1406(a) to the Southern District of New York. The two defendants appeared in the New York district court and moved to have the case dismissed on the ground that the district court in Pennsylvania lacked personal jurisdiction, and therefore could not transfer the action. The New York district court granted this motion and dismissed, and the United States Court of Appeals for the Second Circuit affirmed.

2. The Court also finds that based on all the facts and circumstances of this case, defendant has failed to satisfy its burden of demonstrating that the convenience of the parties and of the witnesses compels transfer pursuant to 28 U.S.C. § 1404(a). The Court further finds that in the interests of justice, the circumstances of this case preclude the application of the first-filed rule.

3. 28 U.S.C. § 1406 provides in pertinent part:

The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a).

On certiorari, the Supreme Court reversed. After reviewing the language of section 1406, the Court found that "[n]othing in that language indicates that the operation of the section was intended to be limited to actions in which the transferring court has personal jurisdiction over the defendants." *Id.* at 465, 82 S.Ct. at 915. The Court then turned to the history of the provision and the problem that it was intended to remedy. The Court found that section 1406 was designed to avoid "the injustice which had often resulted to plaintiffs from dismissal of their actions merely because they made an erroneous guess with regard to the existence of some elusive fact of the kind upon which venue provisions often turn." *Id.* at 466, 82 S.Ct. at 915–16. The facts of the *Goldlawr* case demonstrated this injustice. According to the Supreme Court, dismissal would have resulted in plaintiff's losing a substantial part of its cause of action under the statute of limitations. *Id.* Thus, the Court concluded that section 1406 conferred the power upon federal district courts to transfer actions over which they lacked personal jurisdiction. *Id.* at 467, 82 S.Ct. at 916.

 The Court therefore has the power to transfer this action, notwithstanding the fact that it lacks personal jurisdiction over some of the defendants. The next question is whether the Court may sever the claims against the defendants over whom it lacks jurisdiction, transfer those claims to the Northern District pursuant to section 1406, while proceeding with plaintiff's claims against Servidone and Joseph Servidone in this forum.

Another federal district court addressed this precise issue in *Thee v. Marvin Glass & Assocs.*, 412 F.Supp. 1116 (E.D.N.Y.1976). Plaintiff in that case, a self-employed artist and designer, resided in New York. He had designed a game which he called "Artifax." One of the defendants, Marvin Glass & Associates (Marvin Glass), an Illinois limited partnership with its principal place of business in Illi-

nois, designed a game called "Masterpiece." Plaintiff. filed an action in the Eastern District of New York against numerous defendants, asserting numerous copyright, trademark and antitrust claims based on the similarity between the two games. Defendant Marvin Glass moved to dismiss for want of personal jurisdiction.

The district court concluded that Marvin Glass lacked sufficient minimum contacts with New York. However, instead of dismissing Marvin Glass from the action, the Court addressed the question of whether plaintiff's claims against Marvin Glass should be severed pursuant to Rule 21 of the Federal Rules of Civil Procedure and transferred to a different federal district. *Id.* at 1119. First, the court needed to ascertain whether there was another federal district in which the case could have been brought. The court found that the Northern District of Illinois was such a forum, because it would be able to assert subject matter jurisdiction over plaintiff's claims and personal jurisdiction over Marvin Glass. Accordingly, the court severed the plaintiff's claims against Marvin Glass, transferred those claims to the Northern District of Illinois, and proceeded with the remaining claims. *See id.* at 1121.

 The Court finds that the interests of justice merit severing plaintiff's claims against defendants Victoria Servidone, Ray Goddard and Goddard & Blum pursuant to Rule 21.[4] The only remaining question is whether the Northern District of New York is a forum in which these claims "could have been brought" for the purposes of 28 U.S.C. § 1406(a).

 It is clear that the Northern District of New York has personal jurisdiction over these defendants. Not only are these defendants residents of New York for the purposes of jurisdiction, they have consented to jurisdiction in the action already pending in the Northern District. Similarly, defendants cannot seriously contest subject matter jurisdiction. Defendants filed their

---

**4.** Rule 21 provides in pertinent part:
 Any claim against a party may be severed and proceeded with separately.

Fed.R.Civ.P. 21.

own action in the Northern District on the grounds of diversity jurisdiction.

The Court therefore finds that the United States District Court for the Northern District of New York is a forum in which plaintiff's claims against defendants Victoria Servidone, Ray Goddard and Goddard & Blum could have originally been brought. Accordingly, the Court will order the severance of plaintiff's claims against these defendants, and will further order the transfer to the Northern District of New York.

IT IS THEREFORE ORDERED that:

1. defendants Servidone Construction Corporation and Joseph Servidone's motions to dismiss are denied;

2. plaintiff's claims against defendants Victoria Servidone, Ray Goddard and Goddard & Blum (Counts I–V insofar as they relate to these defendants, Counts VII and VIII as to Victoria Servidone, and Counts XII–XVI as to Ray Goddard and Goddard & Blum) are severed from this action pursuant to Rule 21; and

3. plaintiff's action against defendants Victoria Servidone, Ray Goddard and Goddard & Blum is hereby transferred pursuant to 28 U.S.C. § 1406(a) to the United States District Court for the Northern District of New York.